1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

18

JESSE MACUMBA,

Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

Defendant.

_____/

Case No. 1:17-cv-01677-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

19

20

## I.    INTRODUCTION

21          On December 13, 2017, Plaintiff Jesse Macumba ("Plaintiff") filed a complaint under 42

22 U.S.C. § 1383(c) seeking judicial review of a final decision of the Commissioner of Social

23 Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security

24 Income (SSI). (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which

25 were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States

26 Magistrate Judge.[1]

27

28 _____

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 7, 8.)

## II.     BACKGROUND

On August 23, 2013, Plaintiff filed a claim for SSI payments, alleging he became disabled on June 1, 2005, due to "carpal tunnel," back problems, and pain and swelling in his right leg. (Administrative Record ("AR") 26, 80, 89, 193, 214.)  He also complains of a "throat restriction," chest pain and pressure, and states that he uses a cane for ambulation.  (AR 26, 214, 236, 295, 297.) Plaintiff was born on January 12, 1966, and was 47 years old on the application date.  (AR 31, 80, 89, 189, 192.)  Plaintiff reports that he completed the eighth grade and last worked in 1997 as a landscaper/handyman.  (AR 24, 26, 194, 204.)

### A.     Relevant Medical Evidence[2]

#### 1.     Primary Care Physician Madhava Narala, M.D.

On August 2, 2012, Plaintiff presented to Dr. Narala with dysphagia and complaints of occasional choking.  (AR 258.)  He was diagnosed with an esophageal stricture and referred to a gastroenterologist.   (AR 258.)   On August 28, 2012, a gastroenterologist completed an esophagogastroduodenoscopy (EGD), which revealed a healed lower esophageal ulcer, grade I lower esophagitis followed by a hiatal hernia, and moderate gastritis of the stomach.  (AR 263-64.)

#### 2.     Primary Care Physician William Garnica, M.D.

Over a year later, on August 10, 2013, Plaintiff presented to primary care physician William Garnica, M.D., with complaints of throat pain, difficulty swallowing, back pain, and finger cramps. (AR 280.)  Plaintiff's physical examination was normal.  (AR 280.)  Dr. Garnica diagnosed gastritis, gastroesophageal reflux disease (GERD), low back pain, neuropathy, and carpal tunnel syndrome.  (AR 280.)  He prescribed Plaintiff gabapentin, tramadol, omeprazole, and Zantac (ranitidine).  (AR 280.)

Plaintiff saw Dr. Garnica on August 28, 2013, and again reported feelings of food stuck in his esophagus and esophageal stricture.   (AR 276.)   Dr. Garnica noted that Plaintiff had uncontrolled diabetes mellitus with diabetic neuropathy.  (AR 276.)  Metformin was prescribed and

---

[2] Plaintiff's assertions of error are limited to the following: the ALJ's discrediting of the medical opinion of William Garnica, M.D.; the ALJ's reliance at the fifth step of the sequential evaluation process on testimony by the Vocational Expert that conflicts with the Dictionary of Occupational Titles; and the ALJ's failure to establish Plaintiff's literacy. (*See* Doc. 15.)  Only evidence relevant to those arguments is set forth in this Order.

Plaintiff was directed to check his blood sugar daily.  (AR 276.)

On September 27, 2013, Plaintiff returned to Dr. Garnica and requested "stronger meds" to address "tingling pain" to the back of his legs and hands, and his muscle aches.  (AR 275.)  A physical examination was normal.  (AR 275.)  On October 25, 2013, a physical examination was normal and Plaintiff reported that gabapentin helped his diabetic neuropathy symptoms.  (AR 274.)

On December 20, 2013, Dr. Garnica performed a normal physical examination, but observed that Plaintiff had uncontrolled diabetes mellitus type II, diabetic neuropathy, hypertension, and hyperlipidemia.  (AR 311.)  Dr. Garnica continued Plaintiff on metformin.

On March 4, 2014, Dr. Garnica indicated that Plaintiff's hypertension and GERD were stable, and his diabetes mellitus was controlled.  (AR 309.)  That same day, Dr. Garnica completed a "PHYSICAL Residual Functional Capacity [RFC][3] Medical Source Statement" questionnaire.  (AR 303–06.)   He noted Plaintiff's diagnoses of diabetes mellitus II, diabetic neuropathy, hyperlipidemia, and hypertension, and indicated a poor long-term prognosis.  (AR 303.)  Plaintiff's symptoms were listed as feet numbness, fatigue, and blurred vision.  (AR 303.)  Dr. Garnica opined that Plaintiff could lift and/or carry up to fifteen pounds rarely, up to 10 pounds occasionally, and up to five pounds frequently; stand and walk for about one hour in an eight-hour workday; and sit for about one hour in an eight-hour workday, with daily unscheduled breaks for 24 hours and the need to lie down and/or recline for about two hours in an eight-hour workday.  (AR 303–04.)  He indicated that Plaintiff's pain frequently would be severe enough to interfere with the attention and concentration needed to perform simple work tasks, that he would be expected to be off task for more than 30% of an eight-hour workday, and that he would be absent from work more than five days per month.  (AR 305–06).

Plaintiff saw Dr. Garnica on May 13, 2014, who again noted that Plaintiff's hypertension

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

was stable. (AR 371.) Dr. Garnica also noted Plaintiff's diagnoses of diabetes mellitus, diabetic neuropathy, GERD, and high cholesterol. (AR 371.) Plaintiff next saw Dr. Garnica on June 17, 2014; Plaintiff reported he was "doing well" and Dr. Garnica again found Plaintiff's hypertension and diabetes mellitus were stable. (AR 370.)

On July 15, 2014, Plaintiff presented to Dr. Garnica complaining of chronic low back pain and Dr. Garnica prescribed tramadol for symptom relief. (AR 369.) On October 21, 2014, Plaintiff reported pain in his right leg, which Dr. Garnica attributed to diabetic neuropathy. (AR 366.) Dr. Garnica prescribed Plaintiff a trial of Lyrica for pain relief. (AR 366.) Plaintiff later saw Dr. Garnica on February 10, 2015, who noted that Plaintiff's hypertension, diabetes mellitus, and right leg pain symptoms were all stable. (AR 365.) Plaintiff continued to complain of difficulty swallowing. (AR 365.)

On October 29, 2015, Plaintiff returned to Dr. Garnica for a follow-up on his diabetes and hypertension, and reported pain in his legs when he walks. (AR 46–47, 358). Doppler testing on November 12, 2015, showed normal arterial circulation in Plaintiff's legs. (AR 47, 356.)

On January 26, 2016, Dr. Garnica saw Plaintiff and conducted a physical examination, which was normal. (AR 354.) He diagnosed Plaintiff with restless leg syndrome, and prescribed him additional medication. (AR 47, 354). On February 26, 2016, Plaintiff reported pain in both legs, and Dr. Garnica noted that Plaintiff's diabetes was not controlled. (AR 353.)

### 3. Gastroenterologist Ujagger Dhillon, M.D.

On October 23, 2013, Plaintiff established treatment with gastroenterologist Ujagger Dhillon, M.D., who noted Plaintiff's history of dysphagia to sold food for the last four years. (AR 337–39.) Plaintiff's physical examination was normal, and he was diagnosed with unspecified dysphagia, esophageal stricture, obesity, diabetes mellitus type II, hyperlipidemia, and hypertension. (AR 338–39.) Dr. Dhillon recommended that Plaintiff have another EGD. (AR 339.)

On November 20, 2013, Dr. Dhillon performed a second EGD, which showed a hiatal hernia, an esophageal stricture, gastritis, reflux esophagitis, and ulcers of the esophagus. (AR 351–52.)

Plaintiff later returned to Dr. Dhillon on April 15, 2014, after experiencing diarrhea for two days, body aches, and a high temperature. (AR 333–36.) Dr. Dhillon noted that Plaintiff "most likely has viral syndrome" and was prescribed Nexium (a proton pump inhibitor) for his "grade D esophagitis." (AR 335.)

Dr. Dhillon saw Plaintiff on August 21, 2014, and noted a history of "remarkable heartburn upper abdominal pain, nausea" with no relief from Nexium. (AR 328–30.) Dr. Dhillon also noted "severe grade D stricture formation ulcers" with negative biopsies. (AR 328.) On September 15, 2014, Dr. Dhillon performed a third EGD, which showed a hiatal hernia, duodenitis, gastritis, ulcers of the esophagus, and esophageal stricture. (AR 350.)

On March 10, 2015, Plaintiff presented to Dr. Dhillon for a follow-up. (AR 321–323.) Plaintiff's physical examination was normal, and Dr. Dhillon diagnosed Plaintiff with GERD, "Schatzki's Ring, congenital tracheoesophageal fistula, esophageal atresia," and unspecified dysphagia. (AR 323.) A fourth EGD was performed on March 16, 2015, which again showed Grade D esophagitis with esophageal stricture and a hiatal hernia. (AR 349.)

On May 20, 2015, Dr. Dhillon confirmed the diagnoses of GERD, diaphragmatic hernia, and esophageal stricture. (AR 317–20.) On January 6, 2016, Plaintiff presented to Dr. Dhillon for a follow-up. (AR 313–16.) Dr. Dhillon performed a physical examination of Plaintiff, which was normal. (AR 314.) He was diagnosed with esophageal obstruction, GERD with esophagitis, obesity, hypertension, hyperlipidemia, and "other specified diabetes mellitus without complications." (AR 315.) Dr. Dhillon performed a fifth EGD on January 28, 2016, which showed esophagitis and dysphagia. (AR 347–48.)

### 4. Consultative Examiner Steven Stolz, M.D.

On January 20, 2014, Steven Stoltz, M. D., performed an internal medicine evaluation at the request of the Department of Social Services. (AR 288–93.) Dr. Stoltz noted Plaintiff's history of diabetes mellitus type 2, hypertension, and esophageal stricture, and his complaints of multiple aches and pains, fatigue, chest pain, and low back pain. (AR 288–90.) Plaintiff's physical examination was normal. (AR 290–92.) Dr. Stolz diagnosed Plaintiff with type II diabetes mellitus, non-cardiac chest pain, hypertension, possible esophageal stricture with esophagitis,

fatigue, and chronic low back pain.  (AR 292.)  Dr. Stoltz, however, opined that Plaintiff did not have any "functional restrictions based solely on his medical issues."  (AR 293).

**B.      Relevant Evidence Regarding Plaintiff's Ability to Read/Write**

Plaintiff was born in Fresno, California, and attended Lincoln Elementary School through the second grade.  (AR 250.)  Plaintiff thereafter apparently attended Baird, a junior high school, and then Wawona, another junior high school in Fresno.  (AR 54, 248.)  After leaving Wawona in September 1979, Plaintiff transferred to Tenaya, a junior high school, to start the eighth grade.  (AR 248.)  He thereafter attended "Cooper Opportunity" school from November 1979 to March 1980, and appears to have transferred to Washington Junior High in Bakersfield, California.  (AR 248.)  Plaintiff's educational records indicate that his formal education ended during the 1979–1980 school year.  (AR 248, 250.)   The records show that Plaintiff underwent testing in seventh grade in May 1979, Plaintiff had test scores demonstrating the equivalent of 3rd Grade academic skills in reading, spelling, and mathematics (AR 249).

As part of his application for benefits, Plaintiff stated that he could speak, read, understand, and write in English.  (AR 192).  Plaintiff also completed and signed an influenza questionnaire in the medical record.  (AR 310.)

**C.      Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on January 22, 2014, and again on reconsideration on July 10, 2014.  (AR 101–104, 112–17.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 118–120.)  At the hearing on April 14, 2016, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions and his ability to read and write.  (AR 52–63.)

**1.      Plaintiff's Testimony**

At the hearing, Plaintiff testified that he completed the seventh or eighth grade.  (AR 53.)  Plaintiff testified that he could read the words he knew in a newspaper but would not be able to understand any of the articles.  (AR 58–59.)  He testified he could not write a letter to the ALJ or fill out a job application because he did not "have the education to know what to put on it or what they're asking for."  (AR 58-59.)  According to Plaintiff, he "didn't do so well in school" but did

not attend special education classes. (AR 59.) He testified that he dropped out of school because it "just got too hard." (AR 59.) He did complete homework but did not know if it was correct. (AR 59.)

Plaintiff testified he previously had a driver's license, but lost it due to child support payment arrears. (AR 54–55.) He resides in a house with his girlfriend and their two children. (AR 53, 56–57.) Plaintiff would sometimes take public transportation to medical appointments. (AR 55-56.)

### 2. Medical Expert's Testimony

Kweli Amusa, M.D., board certified in internal medicine, testified at the hearing as a medical expert. (AR 44–52.) Dr. Amusa testified that the record reflected severe impairments of peripheral neuropathy with chronic pain, inflammation in the esophagus, and a small bowel with strictures. (AR 45.) Dr. Amusa testified that none of Plaintiff's impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). (AR 45-46).

Dr. Amusa testified that Plaintiff's functional limitations changed over the course of the relevant period (AR 46): (1) from August 2013 through December 31, 2013, Plaintiff was limited to the full range of medium work (AR 51); (2) from January 1, 2014 through September 30, 2015, Plaintiff was limited to the full range of light work, except that he would be limited to frequent postural activities except for occasional stooping; frequent operation of foot controls with the right lower extremity; and no concentrated or frequent exposure to extreme cold or extreme heat (AR 47–48, 51); and (3) since October 1, 2015, Plaintiff was limited to reduced light work with no lifting greater than 20 pounds occasionally and 10 pounds frequently; standing and/or walking 30 minutes continuously, resuming after five or ten minutes, for no more than two hours a day; sitting for six hours a day; never climbing ladders, ropes, or scaffolding; occasionally climbing stairs; frequent postural activities except for occasional stooping; frequent operation of foot controls with the right lower extremity; and no concentrated or frequent exposure to extreme cold or extreme heat (AR 47–48, 50). According to Dr. Amusa, Plaintiff would also need to sit no more than 120 minutes at a time, after which he would need change positions from sitting to

standing.  (AR 50.)

### 3.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff had no past relevant work. (AR 65.)  In a first hypothetical, the ALJ asked the VE to assume a person who has the same age, education, and prior work experience as Plaintiff was limited to medium work.  (AR 65).  The VE testified that such a person could perform the occupations of dishwasher, Dictionary of Occupational Titles ("DOT") 318.687-010, specific vocational preparation (SVP)[4] level of 2, with over 400,000 jobs in the national economy; and hand packager, DOT 920.587-018, SVP 2, with over 600,000 national jobs.  (AR 66.)

The ALJ then asked the VE, in a second hypothetical, what jobs could be performed by a hypothetical person limited to the full range of light work, except that he would be limited to frequent postural activities except for occasional stooping; only frequent operation of foot controls with the right extremity; and no concentrated or frequent exposure to extreme cold or extreme heat. (AR 66.)  The VE testified that such a person could perform the occupations of small products assembler I, DOT 706.684-022, SVP 2, with approximately 190,000 jobs in the national economy; packing-line worker, DOT 753.687-038, SVP 2, with over 600,000 national jobs; and garment bagger, DOT 920.687-018, SVP 1, with approximately 5,000 national jobs.  (AR 66–67.)

In a third hypothetical, the ALJ asked the VE what jobs could be performed by a person with the same limitations as the individual in the second hypothetical, but with the additional limitations standing and or walking for no more than two hours a day for no more than 30 minutes without interruption and with an option to sit for five to ten minutes; sitting for six hours a day but no more than 90 to 120 minutes at a time without changing positions; never climbing ladders, ropes, or scaffolding; and occasionally climbing stairs.  (AR 67.)  The VE testified that, since the hypothetical person was between light and sedentary work, he could perform light work, but at "significantly reduced" numbers.  (AR 67–68.)  The VE testified that such a person could perform

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

the occupations of assembler, small products, as identified previously, but with approximately 45,000 jobs in the national economy; assembler, production, DOT 706.687-010, SVP 2, approximately 30,000 national jobs; and parking lot cashier, DOT 211.462-010, SVP 2, 25,000 national jobs. (AR 67–68). The VE testified that the DOT did not address the "sit/stand options" for these light jobs and that they were not classified as sedentary. (AR 68.) She testified that the jobs of "bench assembler" and "cashier" with reduced sitting, standing or walking existed, "although at smaller numbers." (AR 68.) The VE testified that her reduction in numbers was a "professional estimate" based on her "personal knowledge and professional experience" of how jobs are performed, gained by "working on a variety of cases." (AR 69–70.)

With respect to reading ability, all the occupations identified by the VE are Level 2, which is "the low end" and estimated as "under 6th grade reading level." (AR 72, 73.) She testified if the hypothetical person "could not read at all," the parking lot cashier job would be eliminated because he/she would need to read the money and the ticket, and there would be a reduction by 50 percent from the assembly jobs. (AR 72–73.)

**D.      The ALJ's Decision**

In a decision dated October 28, 2016, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 22–34.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (AR 24–34.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since August 23, 2013, the application date (Step One). (AR 24.) At Step Two, the ALJ found Plaintiff's following impairments to be severe: esophagitis with esophageal stricture and diabetes mellitus, type II, with diabetic neuropathy. (AR 24.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (Step Three). (AR 25.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at Steps Four and Five. *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that, from August 23, 2013, through December 31, 2013, Plaintiff had the RFC to "perform the full range of

medium work as defined in 20 CFR [§] 416.967(c)."  (AR 25.)  From January 1, 2014, through September 30, 2015, Plaintiff had the RFC:

> to perform light work as defined in 20 C.F.R. [§] 416.967(b) except for no more than frequent postural movements but only occasionally stoop.  Also, [Plaintiff] could operate foot controls with the right lower extremity on no more than a frequent basis.  [Plaintiff] would have needed to avoid concentrated (frequent) exposure to extreme heat or cold.

(AR 25.)  Finally, since October 1, 2015, the ALJ found that Plaintiff had the RFC:

> to perform light work as defined in 20 C.F.R. [§] 416.967(b), except for stand and/or walk more than two hours in an eight-hour workday or more than 30 minutes without interruption.  Also, [Plaintiff] then must then [sic] sit for up to 10 minutes before resuming standing or walking.  [Plaintiff] can sit for up to six hours in an eight-hour workday, for up to 90 to 120 minutes without interruption.  Then [Plaintiff] must then be permitted to change positions by standing or walking.  [Plaintiff] can perform most postural movements on no more than a frequent basis, but only occasionally stoop.  [Plaintiff] can occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds.  In addition, [Plaintiff] can operate foot controls with the right lower extremity on no more than a frequent basis.

(AR 25.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record."  (AR 27.)

The ALJ found that Plaintiff has no past relevant work (Step Four), but that, on the basis of the RFC assessment, he retained the capacity to perform other work that existed in sufficient numbers in the national economy (Step Five).  Specifically, from August 23, 2013, through December 31, 2013, a finding of "not disabled" was directed by Rule 203.25 of the Medical–Vocational Guidelines, 20 CFR, Part 404, Subpart P, Appendix 2 ("the Grids").  (AR 33.)  From January 1, 2014, through September 30, 2015, the ALJ found that, based on the RFC assessment, Plaintiff could perform the representative occupations of small products assembler I, packing-line worker, and garment bagger.  (AR 33.)  Finally, since October 1, 2015, the ALJ found that, based on his RFC assessment, Plaintiff could perform the representative occupations of small products assembler I; assembler, production; and parking lot cashier.  (AR 33–34.)

Plaintiff sought review of this decision before the Appeals Council, which denied review

on November 1, 2017.  (AR 1–15.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

### III.     LEGAL STANDARD

**A.     Applicable Law**

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920.  The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of

the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [his] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098). "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'"

*Tommasetti*, 533 F.3d at 1038 (quoting *Robbins*, 466 F.3d at 885). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.    DISCUSSION

Plaintiff contends that the ALJ erred in three ways. First, Plaintiff claims the ALJ erred in affording "little weight" to the opinion of treating physician Dr. Garnica. (*See* Doc. 15 at 5–8.); Second, Plaintiff asserts that the ALJ's Step Five analysis is not supported by substantial evidence because the VE's testimony conflicts with the DOT. (*See* Doc. 15 at 9–12.) Finally, Plaintiff contends the ALJ failed to sustain her burden of demonstrating that Plaintiff is literate. (*See* Doc. 15 at 12–14.)

Defendant counters that the ALJ properly evaluated Dr. Garnica's opinion, and the ALJ's finding that Plaintiff is literate is supported by substantial evidence. (*See* Doc. 16 at 10–12.) Defendant further asserts that the ALJ properly relied on the VE's testimony. (*See id*. at 12–17.)

**A.** **The ALJ Appropriately Assessed the Opinion of Dr. Garnica**

    **1.** **Legal Standard**

The weight given to medical source opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. *Holohan v. Massanari*, 246 F.3d 1195, 1201–02 (9th Cir. 2001); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally speaking, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than a non-examining physician's opinion. *Holohan*, 246 F.3d at 1202.

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830–31. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund*, 253 F.3d at 1157,[5] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes*, 881 F.2d at 751. The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional. *Lester*, 81 F.3d at 831.

    **2.** **Analysis**

Dr. Garnica opined in May 2014 that Plaintiff could lift and/or carry up to fifteen pounds rarely, up to 10 pounds occasionally, and up to five pounds frequently; stand and walk for about

---

[5] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 416.927.

one hour in an eight-hour workday; and sit for about one hour in an eight-hour workday, with daily unscheduled breaks for 24 hours and the need to lie down and/or recline for about two hours in an eight-hour workday. (AR 303–04.) He indicated that Plaintiff's pain frequently would be severe enough to interfere with the attention and concentration needed to perform simple work tasks, that he would be expected to be off task for more than 30% of an eight-hour workday, and that he would be absent from work more than five days per month. (AR 305–06).

As noted by the ALJ (AR 29), Dr. Garnica's opinion is contradicted by the medical opinion evidence of non-examining medical expert Dr. Amusa, who testified at the hearing that, in May 2014, Plaintiff was limited to the full range of light work, except that he would be limited to frequent postural activities except for occasional stooping; frequent operation of foot controls with the right lower extremity; and no concentrated or frequent exposure to extreme cold or extreme heat.[6] (AR 47–48, 51). Thus, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting Dr. Garnica's opinion.

In reviewing the medical evidence and giving only "little weight" to Dr. Garnica's opinion, the ALJ found:

> the overly restrictive functional limitations set forth by Dr. Garnica to be inconsistent with both medical expert testimony at the hearing and the medical evidence of record, including Dr. Garnica's own report of March 4, 2014, which shows that [Plaintiff's] hypertension and GERD were stable, while his diabetes mellitus was under control, and numerous other reports of normal physical examinations dating back to August 10, 2013. The record as a whole supports that [Plaintiff] could perform the full range of medium work from August 23, 2013, through December 31, 2013; a wide range of light work from January 1, 2014, through September 30, 2015; and a reduced range of light work beginning on October 1, 2015, as opposed to the significantly reduced range of sedentary work recommended by Dr. Garnica.

(AR 29 (internal citations omitted).) The ALJ properly rejected Dr. Garnica's assessment of Plaintiff because it was not consistent the objective medical evidence, including Dr. Garnica's own treatment notes. *See Valentine,* 574 F.3d at 692–93 (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting

---

[6] The ALJ accorded "greatest weight" to the opinion of Dr. Amusa (AR 30), a finding that Plaintiff does not challenge.

opinion); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (same); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ properly rejected the opinion of treating physician, where treating physician's opinion was inconsistent with his own examination and notes of claimant); *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (a treating physician's opinion is properly rejected where the treating physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]"); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (finding that the ALJ properly rejected the opinion of a treating physician since it was not supported by treatment notes or objective medical findings); *Johnson v. Shalala*, 60 F.3d 1428, 1433 (9th Cir. 1995) (ALJ properly rejected medical opinion where doctor's opinion was contradicted by his own contemporaneous findings); *Teleten v. Colvin*, No. 2:14-CV-2140-EFB, 2016 WL 1267989, at *5–6 (E.D. Cal. Mar. 31, 2016) ("An ALJ may reject a treating physician's opinion that is inconsistent with other medical evidence, including the physician's own treatment notes.") (citing *Tommasetti*, 533 F.3d at 1041; *Bayliss*, 427 F.3d at 1216); *Khounesavatdy v. Astrue*, 549 F. Supp. 2d 1218, 1229 (E.D. Cal. 2008) ("[I]t is established that it is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion.") (citing *Johnson*, 60 F.3d at 1432–33). An ALJ may also properly discount a treating physician's opinion that is conclusory and not supported by the medical record. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (noting that "an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings") (citing *Tonapetyan*, 242 F.3d at 1149); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.") (citing *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).

As the ALJ noted (AR 29), Dr. Garnica's treatment notes, written *on the same day* he completed his RFC questionnaire, indicate that Plaintiff's diabetes mellitus was controlled and his hypertension and GERD were stable. (AR 309.) Dr. Garnica also found Plaintiff was in no

apparent distress. (AR 309.) The ALJ further observed (AR 27–28, 29) that Dr. Garnica's other treatment notes show normal physical examinations of Plaintiff (AR 274, 275, 280, 311), as well as treatment notes of treating gastroenterologist Dr. Dhillon (AR 338–39). As noted by the ALJ, other physical examinations of Plaintiff performed in 2015 and 2016—after Dr. Garnica opined that Plaintiff's ability to work was significantly impaired by his diabetes mellitus, diabetic neuropathy, hyperlipidemia, and/or hypertension—were also normal. (AR 314, 323, 354.) Objective testing performed in 2015 showed normal arterial circulation in Plaintiff's legs. (AR 356.)

Such normal findings fail to support Dr. Garnica's opinion that Plaintiff was so significantly impaired that he is not physically capable of working an eight-hour day, five days a week, on a sustained basis, even with some limitations. The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Thomas*, 278 F.3d at 954; *see also Batson*, 359 F.3d at 1196 ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ."). When the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld. *Thomas*, 278 F.3d at 954. As such, the Court finds that substantial evidence supports the ALJ's finding that Dr. Garnica's treatment notes and the medical evidence of record showed essentially normal findings that are entirely inconsistent with the severe limitations Dr. Garnica assessed. This inconsistency was a specific and legitimate reason for the ALJ to discount Dr. Garnica's opinion. *See Bayliss*, 427 F.3d at 1216; *Rollins,* 261 F.3d at 856; *Connett*, 340 F.3d at 875; *Tonapetyan*, 242 F.3d at 1149.

**B.      The ALJ Properly Adopted the VE's Testimony at Step Five**

Plaintiff contends the ALJ improperly found that Plaintiff could perform the assembler and cashier jobs because there is a deviation between Plaintiff's RFC and the description of these positions in the DOT. Specifically, he alleges that the ALJ's finding that Plaintiff's RFC since October 1, 2015, limits him to standing and/or walking no more than two hours total in an eight-hour workday and no more than 30 minutes without interruption, at which point he must sit for up to 10 minutes before resuming standing or walking (the "sit/stand option"), conflicts with the DOT

descriptions of these jobs, which are light exertional levels. (*See* Doc. 15 at 10–11.)

Defendant asserts that the ALJ properly relied on the VE's testimony because she adequately explained the basis for the reduction in job numbers in view of the RFC's sit/stand option and reduced walking limitation. (Doc. 16 at 8–9.)[7]

### 1. Legal Standard

At Step Five, the Commissioner considers the RFC assessment, the claimant's age, education, and work experience to determine if the claimant can perform other work. 20 C.F.R. § 416.920(a). The RFC assessment consists of the "physical and mental" limitations on what a claimant can do because of his impairments. 20 C.F.R. § 416.945(a)(1). The ALJ then evaluates potential occupations that a claimant can perform. *See* 20 C.F.R. § 416.966. The DOT is used to determine what jobs exist in the national economy. *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015).

The DOT is the Commissioner's "primary source of reliable job information" and creates a rebuttable presumption as to a job classification. *Johnson*, 60 F.3d at 1434 n.6 (9th Cir. 1995); *see also Tommasetti*, 533 F.3d at 1042. An ALJ may also seek VE testimony to determine whether a plaintiff can perform any work. The ALJ relies on the DOT and VE testimony to determine whether—given the claimant's RFC, age, education, and work experience—the claimant "actually can find some work in the national economy." 20 C.F.R. § 416.966(e); *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015); *Valentine*, 574 F.3d at 689. "When there is an apparent conflict between the [VE's] testimony and the DOT—for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear to be more than

---

[7] Defendant also asserts that Plaintiff has forfeited any challenge of the ALJ's Step Five finding because Plaintiff's counsel failed to cross-examine the VE about the alleged conflict between Plaintiff's RFC and the identified occupations as described in the DOT. The Commissioner relies on *Shaibi v. Berryhill*, 883 F.3d 1102, 1109-1110 (9th Cir. 2018), in making this argument. In *Shaibi*, the claimant sought to introduce new evidence that contradicted the VE's estimates of the number of "other work" positions available in the national and local economies. *Id*. at 1108. The Ninth Circuit held that "when a claimant fails entirely to challenge a vocational expert's job numbers during administrative proceedings before the agency, the claimant forfeits such a challenge on appeal, at least when that claimant is represented by counsel." *Id*. at 1109. Because Plaintiff here is not specifically challenging the VE's job numbers based on alternative sources for those numbers, but is instead challenging the availability of the occupations themselves, the holding of *Shaibi* does not apply. *See Lamear v. Berryhill*, 865 F.3d 1201, 1206 (9th Cir. 2017) (holding that claimant's counsel's failure to question the VE about conflicts between his testimony and the DOT did "not relieve the ALJ of his express duty to reconcile apparent conflicts through questioning").

the claimant can handle—the ALJ is required to reconcile the inconsistency." *Zavalin*, 778 F.3d at 846 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1153–54 (9th Cir. 2007)). An ALJ may not rely on VE testimony regarding the requirements of a particular job without first inquiring whether the VE's testimony conflicts with the DOT. *Massachi*, 486 F.3d at 1152–53. An ALJ's failure to inquire into an apparent conflict is harmless where there is no actual conflict between the RFC and the DOT. *Ranstrom v. Colvin*, 622 F. App'x. 687, 689 (9th Cir. 2015) (citing *Massachi*, 486 F.3d at 1154 n.19).

To accept VE testimony that deviates from the DOT, the record must contain "persuasive evidence to support the deviation." *Pinto*, 249 F.3d at 846 (quoting *Johnson*, 60 F.3d at 1435). "Evidence sufficient to permit such a deviation may be either specific findings of fact regarding the claimant's residual functionality, or inferences drawn from the context of the [VE]'s testimony." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997) (citations omitted). If the ALJ fails to address the contradiction, then a "gap" exists in the record, and that "gap" precludes the court from determining whether the ALJ's decision is supported by substantial evidence. *Zavalin*, 778 F.3d at 846.

## 2. Analysis

Here, the ALJ determined that beginning on October 1, 2015, Plaintiff had the RFC to perform "light work" but with various exertional limitations, including limiting Plaintiff to standing and/or walking for a total of two hours out of an eight-hour workday for no more than 30 minutes at a time, at which point he must sit for up to 10 minutes before resuming standing or walking. (AR 25.) During the hearing, the ALJ presented a hypothetical to the VE that included these limitations. (AR 67.) The VE testified that a person with Plaintiff's limitations could perform the jobs of small products assembler I; assembler, production; and parking lot cashier. (AR 67–68.) The VE also eroded the number of jobs available in the national economy, based on her personal knowledge and professional experience, to reflect Plaintiff's limitations. (AR 68–69.)

Plaintiff premises his argument on Social Security Ruling ("SSR") 83-10, which specifies that "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a

workday, the *full range* of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." TITLES II & XVI: DETERMINING CAPABILITY TO DO OTHER WORK-THE MED.-VOCATIONAL RULES OF APPENDIX 2, SSR 83-10, 1983 WL 31251 (S.S.A. Jan. 1, 1983) (emphasis added). *See also* 20 C.F.R. § 416.967(b). Plaintiff's reliance on SSR 83–10, however, is unavailing. SSR 83-10 does not require six hours of standing and/or walking for all jobs classified as light work; it merely describes the activities that would be required of a person that is able to perform the *full range* of light work. In contrast, the ALJ in this case explicitly found that Plaintiff's limitations, including the standing and walking limitations, did *not* allow him to perform the full range of light work that is set forth in SSR 83-10. (*See* AR 25.) *See Polley v. Comm'r*, 173 F. App'x 861 (9th Cir.1999) (rejecting argument that sit/stand option precludes finding of light work); *Rosales v. Colvin*, No. SACV 12–753 AGR, 2013 WL 6152861, at *13 (C.D. Cal. Nov. 22, 2013) (same).

Nor did the VE base her testimony on a hypothetical individual who was capable of performing the full range of light work. SSR 83-12 addresses the procedures when, as here, Plaintiff can do less than the full range of light work. *See* TITLES II & XVI: CAPABILITY TO DO OTHER WORK-THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING EXERTIONAL LIMITATIONS WITHIN A RANGE OF WORK OR BETWEEN RANGES OF WORK, SSR 83-12, 1983 WL 31253 (S.S.A. Jan. 1, 1983). "[W]hen a claimant must alternate periods of sitting and standing, the ALJ is directed to consult a vocational expert." *Delorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991). *See also* SSR 83-12; POLICY INTERPRETATION RULING: TITLES II & XVI: USE OF VOCATIONAL EXPERT & VOCATIONAL SPECIALIST EVIDENCE, & OTHER RELIABLE OCCUPATIONAL INFO. IN DISABILITY DECISIONS, SSR 00–4P, 2000 WL 1898704, at *3 (S.S.A. Dec. 4, 2000) ("The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A [VE] . . . may be able to provide more specific information about jobs or occupations than the DOT."). The ALJ did so, and the VE considered the limitations on light work in the hypothetical question posed by the ALJ, including the sit/stand option, and reduced the number of jobs available nationally to an individual with those limitations, based on her knowledge and experience. (AR

67–69.) A VE's recognized expertise provides the necessary foundation for his or her testimony and no additional foundation is required. *Bayliss*, 427 F.3d at 1218. *See also Avilez v. Berryhill*, 677 F. App'x 373, 374–75 (9th Cir. 2017) ("[T]he VE based his uncontradicted opinion on twenty years of experience, knowledge of characteristics, and requirements of jobs in the local area, and review of the evidence . . . . [T]o the extent the VE's testimony differed from the Dictionary of Occupational Titles, the ALJ correctly relied on the expert testimony because the VE provided persuasive evidence to support the deviation.") (internal citations and quotations omitted); *Fox v. Barnhart*, 42 F. App'x 911, 912 (9th Cir.2002) (ALJ may rely on VE's testimony when the expert specifically eroded the number of available [jobs] to address an apparent conflict with the DOT); *Taylor v. Astrue*, No. CV 10–03328–JEM, 2011 WL 976777, at *4–5 (C.D. Cal. Mar. 18, 2011) ("The VE's experience and expertise enabled her to justify credibly that 50 percent of light exertional jobs can be performed with only occasional standing and walking" and her opinion is therefore "substantial evidence on which the ALJ properly relied in making his step five determination."). Moreover, Plaintiff does not dispute that the VE identified jobs that would accommodate his stand/walk restriction.

In sum, there is no inconsistency between the ALJ's RFC assessment and the finding that Plaintiff can perform the jobs identified by the VE. *See Polley*, 173 F. App'x 861; *Rosales*, 2013 WL 6152861, at *13. The ALJ properly relied on the VE's testimony because the hypothetical presented to the VE considered all of the claimant's limitations that were supported by the record, including Plaintiff's additional stand/walk limitation. *See Thomas*, 278 F.3d at 956 (considering VE testimony reliable if the hypothetical posed includes all of claimant's functional limitations); *Bayliss*, 427 F.3d at 1218 ("A VE's recognized expertise provides the necessary foundation for his or her testimony."); *see also Avilez*, 677 F. App'x at 374–75. Accordingly, the ALJ did not err at Step Five. *Cf. Avilez v. Colvin*, No. EDCV 14–0732–JPR, 2015 WL 1966916, at *6 (C.D. Cal. Apr. 30, 2015), *aff'd sub nom. Avilez v. Berryhill*, 677 F. App'x 373 (9th Cir. 2017); *Ortiz v. Colvin*, No. ED CV 14–61–AS, 2014 WL 7149544, at *4–5 (C.D. Cal. Dec. 15, 2014).

**C.      Substantial Evidence Supports the ALJ's Finding that Plaintiff is Literate**

Finally, Plaintiff asserts that he is illiterate, and the ALJ erred by conflating his ability to

communicate in English with literacy. (Doc. 15 at 12–14.) Defendant responds that the ALJ's finding that Plaintiff was literate was supported by substantial evidence in the record. (Doc. 16 at 13.)

### 1. Legal Standard

The Social Security regulations define the "ability to communicate in English" as "the ability to speak, read and understand English." *See* 20 C.F.R. § 416.964(b)(5). "Illiteracy" is defined as "the inability to read or write." *See* 20 C.F.R. § 416.964(b)(1). A claimant who can read or write a simple message in English such as instructions or inventory lists is not considered illiterate. *Id.* Generally, an illiterate person has had little or no formal schooling. *Id.* The Social Security Administration emphasizes that "the numerical grade level that you completed in school may not represent your actual educational abilities," but "if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities." 20 C.F.R. § 416.964(b). "The Commissioner bears the burden of establishing that Plaintiff is literate." *Silveira v. Apfel*, 204 F.3d 1257, 1261 (9th Cir. 2000).

### 2. Analysis

After considering the evidence set forth in the record regarding Plaintiff's ability to read and write, including Plaintiff's educational records, the ALJ found that Plaintiff has a "limited education" and is able to communicate in English. (AR 31–32.) The ALJ stated, in pertinent part:

> At the hearing, [Plaintiff] testified that he is illiterate, despite having a formal seventh or eighth grade education. . . . Upon review, the undersigned finds that [Plaintiff's] educational records do not reflect a history of instruction in a special education setting, nor do they establish illiteracy in and of themselves, let alone meet the guidelines to be considered illiterate under Agency regulation and policy. . . . Educational records show that during 7th Grade testing in May of 1979, [Plaintiff] had test scores demonstrating the equivalent of 3rd Grade academic skills in reading, spelling, and mathematics, even though he had been absent for 79 days, or approximately half of the school year, with 51 days unexcused. . . . At the hearing, [Plaintiff] testified that he found school hard; however, he confirmed that he was never placed in special education. . . . In summary, the undersigned does not find that [Plaintiff] has rebutted a presumption that he is not illiterate, which was created by his formal seventh or eighth grade education. [Plaintiff] is presumed to be not illiterate by virtue of his having more than a marginal formal education,

and the record as a whole does not establish that he is functionally illiterate. This conclusion is consistent with his depiction of his past work as a self-employed landscaper, as well as his testimony that he had been a licensed driver through about 2009; could read the newspaper, despite not understanding all of the words; and is raising a family with his girlfriend.

(AR 31–32.) The Court finds that the ALJ did not err in finding that Plaintiff is able to read and write. To begin with, Plaintiff did not testify at the hearing that he could not read or write. Instead, as the ALJ pointed out (AR 32), Plaintiff testified he could read the words he knew in a newspaper, despite not understanding the articles. (AR 58–59.) Plaintiff testified he could not write a letter to the ALJ or fill out a job application, not because he was unable to write, because he did not "have the education to know what to put on it or what they're asking for." (AR 58-59.) He testified that he "didn't do so well in school" but he did not attend special education classes. (AR 59.) He completed homework but did not know if it was correct. (AR 59.) Although he did not have one at the time of the hearing, Plaintiff testified he was previously issued a driver's license, which he obtained by taking an audio-recorded test with written "yes or no" answers. (AR 54, 74–75.) He lost his license due to child support payment arrears, *not* because he was unable to read or write. (AR 55.)

In addition to Plaintiff's testimony, there is evidence in the record that conflicts with a finding that Plaintiff is "illiterate" under the regulations. As observed by the ALJ (AR 31–32), Plaintiff had a seventh- or eighth-grade education (AR 54, 194, 248–50), which is consistent with the regulatory definitions of "marginal" or "limited" education, rather than "illiteracy." *Compare* 20 C.F.R. § 416.964(b)(2) (Marginal education "means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.") and 20 C.F.R. § 416.964(b)(3) (Limited education "means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.") with 20 C.F.R. § § 416.964(b)(1) ("Generally, an illiterate person has had little or no formal schooling."). A form titled "Disability Report—Adult—Form SSA-3368," which was completed by Plaintiff, indicates

he can understand, speak, read, and write in English. (AR 192, 193.) A form entitled "Disability Report—Field Office—Form SSA-3367" indicates there was a face-to-face interview with Plaintiff by interviewer "P. Cooper" on August 23, 2013. (AR 189–91.) The interviewer indicated Plaintiff did not have any difficulty hearing, reading, understanding, talking, answering, or writing. (AR 190.) There are multiple medical forms in the record that are signed by Plaintiff and indicate that he understood their contents without assistance. (*See, e.g.*, AR 267, 278–79, 310.)

Except for Plaintiff's allegations based on portions of his hearing testimony,[8] the record is devoid of, and Plaintiff fails to direct the Court to, any evidence demonstrating illiteracy. The Commissioner, not this Court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence, and determine the case accordingly. Reviewing courts must consider the evidence that supports as well as detracts from ALJ's conclusion. *See Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198. This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in the evidence," moreover, "if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney*, 981 F.2d at 1019. Here, substantial evidence in the record—including Plaintiff's testimony, educational records, applications, disability reports, medical forms, and daily activities—supports a conclusion that Plaintiff could at least "read or write a simple message" under 20 C.F.R. § 416.964(b)(1). *Cf. White v. Colvin*, No. CV-15-08169-PCT-JZB, 2016 WL 5676032, at *8–9 (D. Ariz. Sept. 29, 2016) (finding that the plaintiff's educational records showing failing grades in ninth grade and poor attendance did not conclusively establish that she is illiterate, where there was other evidence in record regarding the plaintiff's literacy, including the fact that the plaintiff previously obtained a driver's license, "which presumably would require recognition of words, letters, and symbols"); *Bahoo v. Colvin*, Case No. 15CV523-WQH(KSC), 2016 WL 7647595, at *12–14 (S.D. Cal. June 6, 2016) (finding

---

[8] The ALJ found that Plaintiff's subjective testimony was "not entirely consistent with the medical evidence and other evidence in the record" (AR 27), a finding that Plaintiff does not challenge.

the plaintiff's allegation of illiteracy contradicted by, among other things, a "Disability Report—Field Office" report in which the interviewer indicated the plaintiff did not have any difficulty hearing, reading, understanding, talking, answering, or writing.); *Ogannesyan v. Colvin*, Case No. CV 15-0220-JPR, 2016 WL 2982182, at *17 (C.D. Cal. May 23, 2016) ("Although Plaintiff claims to be unable to read English or write anything other than his name in English, the ALJ found that he generally was not credible; moreover, Plaintiff apparently was able to complete lengthy written disability and function reports on his own and in English.") (internal citations omitted); *Urrabazo v. Colvin*, No. 1:14-CV-00309-SKO, 2015 WL 4392988, at *19 (E.D. Cal. July 17, 2015) (finding substantial evidence supported the ALJ's literacy finding where the plaintiff completed the ninth grade despite being in special education classes and was able to read simple children's books to his six-year old child despite testifying he was unable to read and understand a newspaper or write a grocery list without assistance); *Frear v. Astrue*, No. CV 12–4532–JPR, 2013 WL 454902, at *6 (C.D. Cal. Feb. 6, 2013) ("Although since applying for disability benefits Plaintiff has claimed that he can't read, the ALJ had a substantial basis in the record to reject that claim. As noted, Plaintiff himself has at times acknowledged that he can read and understand English . . . Plaintiff's handwritten completion of the disability form was alone substantial evidence on which the ALJ could rely to find that Plaintiff was not illiterate."). Plaintiff does not demonstrate otherwise. The ALJ therefore did not err in finding that Plaintiff is not illiterate, but instead has a "limited education." *See* 20 C.F.R. § 416.964(b)(3).

## V.  CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:  __**January 2, 2019**__                 _____/s/ *Sheila K. Oberto*_____
                                                UNITED STATES MAGISTRATE JUDGE